[Cite as *State v. Hannan*, 2020-Ohio-755.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J |
| Plaintiff-Appellee | Hon. W. Scott Gwin, J.<br>Hon. Earle E. Wise, Jr., J. |
| -vs- | Case No. 2019CA00037 |
| KIM HANNAN | |
| Defendant-Appellant | O P I N IO N |

CHARACTER OF PROCEEDINGS:    Appeal from the Stark County Court of
Common Pleas, Case No. 2018CR0520

JUDGMENT:    Affirmed

DATE OF JUDGMENT ENTRY:    March 2, 2020

APPEARANCES:

For Plaintiff-Appellee

JOHN D. FERRERO
Prosecuting Attorney
Stark County, Ohio

RONALD MARK CALDWELL
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza, South – Suite 510
Canton, Ohio 44702-1413

For Defendant-Appellant

GEORGE URBAN
116 Cleveland Avenue, N.W.
808 Courtyard Centre
Canton, Ohio 44702

*Hoffman, P.J.*

**{¶1}** Appellant Kim Hannan appeals the judgment entered by the Stark County Common Pleas Court convicting him of 51 counts of securities fraud (R.C. 1707.44(B)(4), (G),(M)(1)(a),(b)), aggravated theft (R.C. 2913.02(A)(1),(2),(3)) and theft from a person in a protected class (R.C. 2913.02(A)(1),(2),(3)), and sentencing him to an aggregate term of incarceration of twenty years. Appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

**{¶2}** Appellant was a registered financial advisor who had worked for several financial firms. He acquired clients from his employment, and after leaving the firms he worked for, he became desperate for money. Appellant incurred debt due to personal expenses, gambling, and spousal support obligations, and began to look for an alternate method to make money. He started a dry cleaning business, followed by a doggie daycare business, and finally a company called HR Resources. Beginning in 2014, he looked to his clients to provide investment funds for his businesses.

**{¶3}** Buddy and Gloria Scott were two of Appellant's clients from his employment with investment firms. He asked the Scotts to invest in his dry cleaning business. They initially gave Appellant $50,000, and Appellant gave them a cognovit note for $75,000. Over a period of time, the Scotts gave Appellant $805,000 in six transactions, secured by Appellant's cognovit notes. They saw the money as an investment and not a loan. Appellant continued to tell the Scotts the business was doing well, when in actuality the business was losing money, he was unable to make payroll, and debt was mounting.

**{¶4}** Michael and Nanette Maletich also invested money in Appellant's businesses at his urging. They gave Appellant $168,225 over six transactions, secured

by cognovit notes.   Appellant told them only good news about the businesses, and sent them monthly return checks on their investments.

{¶5}    Nanette Maletich's sister, Renee Leimgruber, was approached by Appellant to invest in the doggie daycare business.  She invested $30,000, secured by a cognovit note.  Appellant paid her $637.41 via three checks.

{¶6}    Appellant approached John and Mary Ruth to invest in his dry cleaning business, telling them they could receive a higher rate of return than by staying with their investments previously made through his firm.   They gave him $125,000 secured by a cognovit note.  He later convinced them to give him another $422,000.  He told them the dry cleaning business was doing well, and he expected $700,000 in profits, to encourage further investment in the business.

{¶7}    Appellant also convinced David and Anne Heinzman to invest $145,000 over four transfers, all secured by cognovit notes.  He told them they could do better investing in his businesses than by staying with their stock investments.  They received some payments from Appellant, which gave credence to Appellant's representations the businesses were doing well.

{¶8}    In October, 2017, Appellant sent letters to all nine clients terminating the relationships and admitting he could not pay them back.   Appellant defrauded these clients out of a total of $1,645,255.00

{¶9}    Meanwhile, Appellant met Pamela Crawford via an online dating site, and dated her from 2015, to 2017.  Appellant told Crawford about his financial advising business, as well as his dry cleaning business.  He convinced Crawford to quit her job and work at the dry cleaning business.  She could tell something was wrong and the

business was not doing well, and she quit working for Appellant after several weeks. However, she continued to date Appellant. The dates included regular expensive dinners out and trips to a casino in Cleveland, where they were comped rooms and the pit boss called Appellant by his first name. Knowing Appellant was soliciting investments from clients for his businesses, she feared the clients were not going to get their money back. Crawford made an anonymous complaint with the Securities and Exchange Commission (SEC) about Appellant's activities.

{¶10} As a result of Crawford's tip, Ohio authorities began to investigate Appellant's activities. Leo Fernandez, a fraud investigator with the Ohio Auditor's Office, and Janice Hitzeman, an Attorney Inspector with the Ohio Department of Commerce, began the investigation. A search warrant was executed on Appellant's businesses, and bank and financial records were obtained through subpoenas. Fernandez determined Appellant received over $1.6 million from the nine targeted investors, the businesses were failures, and Appellant used some of the investment money to pay for gambling, spousal support, and other personal expenses. In addition, Appellant used some of the money from the nine investors to pay the other investors a return on their investments. The audit revealed Appellant commingled personal and business expenses. When Fernandez interviewed Appellant, Appellant stated he wasn't making enough money in his investment advisory business, so he reached out to clients to invest in his other businesses. Appellant claimed all the invested money had been spent on operating expenses for the businesses.

{¶11} At a later investigative interview, Appellant admitted his transactions were securities violations. For purposes of the Ohio Securities Act, both a loan and an

investment are defined as a security, and a cognovit note is also a security. While investments and loans are not guaranteed to be profitable, the decision to make an investment or loan must be done knowingly, with full disclosure of material information. Hitzeman concluded from her investigation Appellant deceived his nine investors into giving him money, the transfers constituted sales, and Appellant made false representations in order to obtain their money. She further concluded Appellant should have put all of the investment money into the businesses instead of using it for personal expenses.

**{¶12}** In 2018, the Stark County Grand Jury charged Appellant with 53 counts of state securities fraud, one count of theft from a person in a protected class, and one count of aggravated theft.

**{¶13}** Before trial, Appellant waived his right to counsel and proceeded pro se. The State offered Appellant a plea deal, which he rejected. The case proceeded to jury trial in the Stark County Common Pleas Court. On the second day of trial, Appellant indicated he wished to plead guilty. After reviewing the plea forms, he recanted and opted to proceed to trial. He also requested his standby counsel represent him. The trial court declared a mistrial and referred Appellant for a competency evaluation.

**{¶14}** Appellant was found competent to stand trial. Before the second jury trial, the State dismissed two counts of securities fraud. The case proceeded to trial on the remaining counts. Appellant was convicted of the remaining 51 counts of securities fraud, as well as the aggravated theft and theft counts. He was sentenced to an aggregate term of incarceration of 20 years and ordered to pay restitution in the amount of $1,645,255.00.

**{¶15}** It is from the February 14, 2019, judgment of conviction and sentence Appellant prosecutes this appeal, assigning as error:


I.    APPELLANT'S CONVICTIONS WERE AGAINST THE SUFFICIENCY AND/OR MANIFEST WEIGHT OF THE EVIDENCE.

II. THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S OBJECTION AND PERMITTING JIM LUPICA TO TESTIFY ABOUT FIDUCIARY DUTY.


I.

**{¶16}** In his first assignment of error, Appellant argues the judgment is against the sufficiency and manifest weight of the evidence because the State did not prove he intended to defraud any of his clients.

**{¶17}** In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St. 3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, *quoting State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1983).

**{¶18}** An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

proven beyond a reasonable doubt. *State v. Jenks,* 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1991).

{¶19} Appellant was convicted of theft and aggravated theft in violation of R.C. 2913.02(A)(1), (2), and (3), which provides:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

(3) By deception.

{¶20} He was convicted of 51 counts of securities fraud in violation of the following sections of R.C. 1707.44:

(B) No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for any of the following purposes:

(4) Selling any securities in this state.

(G) No person in purchasing or selling securities shall knowingly engage in any act or practice that is, in this chapter, declared illegal, defined as fraudulent, or prohibited.

(M)(1) No investment adviser or investment adviser representative shall do any of the following:

(a) Employ any device, scheme, or artifice to defraud any person;

(b) Engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person.

**{¶21}** Appellant argues the State did not present any evidence he made false representations in order to obtain the money of his nine clients. He asserts he was not trying to mislead his clients, and no one testified to specific fraudulent acts. He argues misfortune does not constitute fraud.

**{¶22}** The testimony demonstrated Appellant persuaded his clients investing in his businesses would be more profitable than a stock portfolio. He continued to solicit more money from his clients, telling them the businesses were doing well and making a profit, when in actuality, the businesses were losing money. He buttressed his claims the businesses were doing well by paying the clients a return on their investment, which he took from other investors rather than from the profits of the businesses. John Ruth testified Appellant told him specifically the dry cleaning business was projected to make $700,000 in profit one year.

**{¶23}** The State presented evidence instead of using the money to invest in the businesses, he used the money to support a lavish lifestyle and pay his personal debts,

which alarmed Crawford (his paramour) to the extent she reported his activities to the SEC. The evidence reflected Appellant did not tell the investors he was using the money on personal expenses and to pay false "returns" to other investors, but rather they believed the money was invested in his businesses.

{¶24} The State presented evidence, if believed by the jury, to support a finding Appellant intentionally made false representations to obtain money from his nine clients.

{¶25} While Appellant argues generally the witnesses were not credible and the investigation into his activities was not thorough, we find the jury did not lose its way in believing the testimony of Appellant's clients and the investigators, and the verdict is not against the manifest weight of the evidence.

{¶26} The first assignment of error is overruled.

II.

{¶27} In his second assignment of error, Appellant argues the court erred in allowing Jim Lupica to testify concerning the concept of "fiduciary duty," as the concept was not relevant to the case and created a danger the jury convicted Appellant for breaching a duty owed to his clients rather than for violation of statute.

{¶28} Jim Lupica testified about his working relationship with Appellant while Appellant was employed at Stratos Wealth Partners. Appellant worked there for about a year, during which time Lupica formed a partnership with Appellant's investment business. Lupica testified brokers and advisors owe their clients a fiduciary duty when managing their money. He defined fiduciary duty as "putting the client first; [y]ou are subordinated to that client; you are working for that client and you owe them full loyalty, full disclosure of all investment advice that you're giving." Tr. (II) 188. Lupica further

testified to tell the client only the good aspects of a product is a violation of fiduciary duty. Appellant's objection to Lupica's testimony was overruled.

**{¶29}** "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St. 3d 269, 271, 569 N.E.2d 1056 (1991).

**{¶30}** Evid. R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 402 provides:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible.

**{¶31}** As Appellant argued in his first assignment of error, the State was required to prove Appellant defrauded his clients. The concept of fraud is intertwined with Appellant's fiduciary duties owed his clients in this case. The fact he not only lied to his clients about how the businesses were doing but also failed to tell them both good and bad facts material to their investment decisions relates directly to both the fiduciary duties

owed his clients and his intent to defraud them.  Appellant's violation of the fiduciary duties he owed his clients, duties he was aware of as a license financial advisor, reflects upon his intent when he persuaded his clients to give him money for his businesses.  We find the concept of fiduciary duty was relevant in the instant case, and the trial court did not err in admitting Lupica's testimony over Appellant's objection.

**{¶32}**  The second assignment of error is overruled.

**{¶33}**  The judgment of the Stark County Common Pleas Court is affirmed.


By: Hoffman, P.J.

Gwin, J.  and

Wise, Earle J. concur